UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C.Y., a minor child, by her
next friend, TERRI ANTONE,

    Plaintiff,                                     Case No. 12-CV-11888

v.                                                  HON. MARK A. GOLDSMITH

LAKEVIEW PUBLIC SCHOOLS, et al.,

    Defendants.
_____/

**OPINION AND ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 25)**

**I. INTRODUCTION**

In this action under 42 U.S.C. § 1983, Plaintiff C.Y., a minor child, alleges that her procedural due process rights were violated when she was suspended and expelled from Lakeview High School. Defendants are (1) Lakeview Public School District (Lakeview); (2) Karl D. Paulson, the superintendent of Lakeview Public School District; (3) Brent Case, the principal of Lakeview High School, (4) Heather Huber, an assistant principal of Lakeview High School, and (5) the Lakeview Public School District Board of Education (the Board). The individual defendants are named in their official capacities only. The Board is named "individually and collectively."

Before the Court is Defendants' motion for summary judgment (Dkt. 25). C.Y. has filed a response (Dkt. 30) and Defendants have filed a reply (Dkt. 31). Oral argument was held on April 4, 2013. For the reasons explained below, the Court grants the motion.

## II. BACKGROUND

During the 2011-2012 school year, C.Y. was a female ninth grade student at Lakeview High School. Pl.'s Aff. ¶ 2 (Dkt. 30-2). Although C.Y. lived in the city of Roseville, Michigan and within the Roseville Community Schools District, C.Y. attended Lakeview High School as a "School of Choice" student. Case Aff. ¶ 3 (Dkt. 25-16).[1] C.Y. was friends with another Lakeview student, A.B, but then had a falling out with her. Pl.'s Aff. ¶ 2. According to Defendant Heather Huber, assistant principal of Lakeview High School, C.Y. posted a picture of a t-shirt on Facebook in mid-February 2012. Huber Aff ¶ 11 (Dkt. 25-14). The t-shirt depicted A.B.'s mother lying in a coma with an inscription underneath reading "dead bitch." Id.[2]

On February 21, 2012, Huber received a complaint from A.B. and a school counselor that C.Y. had brought a knife to school and was planning to stab A.B. after school. Id. ¶ 4. Huber also recounts that A.B. told her that she had seen a threatening "tweet" on C.Y.'s Twitter account.[3] Id. Huber went to find C.Y., but C.Y. had gone home from school early. Id. ¶ 5.

Huber then interviewed students, obtaining four written statements. Id. ¶¶ 7-12. The first student Huber interviewed was J.Y., a friend of C.Y. Id. ¶ 7. J.Y. confirmed that C.Y. had shown her the knife. Id. ¶ 8. J.Y. also showed Huber three texts from C.Y. relating to the

---

[1] The School of Choice program grants local school districts discretion to enroll nonresident students. See, e.g., Clark v. Banks, 193 F. App'x 510 (6th Cir. 2006) (explaining Michigan's "school of choice" system).

[2] Two other students claimed that they, not C.Y., designed the t-shirt. Written Statement of I.S. and J.S. (Dkt. 30-5).

[3] The tweet allegedly said "stab stab stab. going to stab stab stab you today to see your insides, ya ya ya." Huber Aff. ¶ 4.

incident. Id. ¶ 10. In the texts, C.Y. did not deny that she had brought a knife to school or that she had made threats to A.B.[4] Id. Huber obtained a written statement from J.Y. Id.

Huber then interviewed J.H., T.K., and A.B and instructed them to compose written statements.[5] Id. ¶ 12. A.B. also showed Huber C.Y.'s tweet on her friend's phone. Id. ¶ 11.

Huber states that she then called C.Y.'s mother, Terri Antone, to: (i) inform her of the statements she had collected, (ii) schedule a meeting with C.Y. at the school to get C.Y.'s version of the events, and (iii) inform Antone of the potential discipline. Id. ¶ 13. C.Y. states that when Huber called, she did not get an opportunity to speak with Huber and that, as C.Y. understood, she was suspended as of the call. Pl.'s Aff. ¶ 5.

Antone then spoke with C.Y., who admitted to her that she made the "tweet," but contends that the message was "threatening no one" and was only intended to get other students, who had threatened to harm C.Y., to "leave her alone." Antone Aff. ¶ 7 (Dkt. 30-3).

The next day, February 22, 2012, Huber met with C.Y., her mother, and her brother. Id. ¶ 8-9. At this meeting, according to Antone, Huber advised C.Y. that she could be expelled, discussed the evidence that had been collected, and confirmed that C.Y would remain suspended until the expulsion hearing. Antone Aff. ¶ 8. C.Y. does not relate information about her meeting with Huber, other than Huber had C.Y. provide a written statement. C.Y. Aff. ¶ 5. Huber states that at the meeting on February 22, she informed C.Y. she could be expelled, presented the evidence from her investigation, and listened to C.Y.'s version of events. Huber Aff. ¶¶ 14-16.

---

[4] According to Huber the texts stated: "Who told AB bout knife," "Someone did. Hmmm, they're gonna think she's a nut case when she tells me. Lol she doesn't have proof I brang a knife," and "I wasn't gonna actually stab her." Huber Aff. ¶ 10.

[5] The written statements of J.H. and T.K. indicate C.Y. had stated that she intended to stab A.B. J.H. and T.K. Written Statements (Dkt. 25-3). A.B.'s written statement reflects that J.H. and J.Y. had told her about C.Y.'s threats. A.B. Written Statement (Dkt. 25-3).

Huber had C.Y. write a statement, in which she admitted that "at 6:30 in the morning I tweeted threatening no one that I was going to stab them knowing that A would see it." C.Y. Statement (Dkt. 25-4).

Given the evidence before her, Huber decided to suspend C.Y. until March 6, 2012. Huber Aff. ¶ 17. Huber also told C.Y. and her mother of potential further penalties, such as a longer suspension or expulsion. Id. Huber followed up this meeting with a letter dated February 23, 2012, to Antone, indicating that C.Y. was suspended from February 21, 2012 through March 6, 2012. 2/23/2012 Huber Letter (Dkt. 25-6).

C.Y. states that at the February 22, 2012 meeting, Defendant Huber did not explain all the evidence that was later presented at C.Y.'s expulsion hearing and that the family was given only a limited opportunity to rebut the allegations against C.Y. with no opportunity to gain her readmission to school. Antone Aff. ¶ 8.

After C.Y. was suspended, Lakeview continued to review the matter. Principal Brent Case sent Antone a letter on February 24, 2012, informing her that because C.Y. had brought a weapon to school, he was required by law to recommend expulsion. Case Aff. ¶ 5; 2/24/2012 Case Letter (Dkt. 25-7).

On March 1, 2012, the Superintendent of Lakeview Public Schools, Karl Paulson, met with C.Y. and Antone to discuss the charges, applicable policies, and recommended expulsion. Paulson Aff. ¶ 5 (Dkt. 25-15). Antone understood that Paulson explained that C.Y.'s entire family could attend the expulsion hearing and would have a chance to be heard. Antone Aff. ¶ 15. After Paulson spoke, Huber presented the evidence and statements she collected throughout the course of her investigation, including J.Y.'s statement indicating C.Y.'s possession of the knife. Paulson Aff. ¶ 8. Paulson then gave C.Y. an opportunity to explain her side of the story.

4

Id. ¶ 9. According to Paulson, C.Y. admitted to making threats about stabbing and an "on-going feud between girls." Id. ¶ 10. Antone disputes this, stating that she, C.Y., and C.Y.'s brother denied that C.Y. brought a knife to school or threatened anyone. Antone Aff. ¶ 11.

At the conclusion of the meeting, Paulson informed C.Y. that the administration would recommend her expulsion. Id. ¶ 11. Following the meeting, Paulson prepared the evidence that would be presented to the Board members at the expulsion hearing. Id. ¶ 13. Paulson memorialized the meeting in a letter to Antone, which also set the date for the expulsion hearing before the Board on March 6, 2012. 3/2/2012 Paulson Letter (Dkt. 25-9). Along with the letter, Paulson enclosed several Board policies, the student handbook, and the material that was to be presented to the Board supporting the school's request for expulsion. Paulson Aff. ¶ 12; 3/2/2012 Paulson letter.

On March 5, 2012, Paulson received a letter from Psychologist William Irving, sent on behalf of C.Y., and a handwritten statement from J.S., another student. Paulson Aff. ¶ 14.

On March 6, 2012, the Board conducted a special meeting for the expulsion hearing. Board Meeting Minutes (Dkt. 25-12). C.Y. attended the meeting with her parents and brother. Huber, Case, and Paulson appeared on behalf of the school. The seven members of the Board were also present at the meeting. At her mother's request, C.Y.'s expulsion hearing was held in closed session. Paulson Aff. ¶¶ 16-17; 3/1/2012 Antone Request (Dkt. 25-8).

C.Y. had wanted her brother to read a prepared statement, but Antone states that the Board did not allow him to read it, as it was a closed session. Antone Aff. ¶ 16. C.Y. also points out that Paulson's March 2, 2012 letter indicated that a closed session was not possible: "You have requested, in writing, that the hearing be held in closed session, but any action taken by the Board of Education must be held in open session." 3/2/2012 Letter from Paulson.

5

Antone also stated that C.Y.'s father was allowed to read the letter, but had difficulty. This difficulty, Antone stated, caused C.Y. embarrassment and the Board members laughed during the reading of the letter. Antone Aff. ¶ 17.

The Board received the school's evidence, including the student statements and C.Y.'s statement. Paulson Aff. ¶ 22. The Board was also given C.Y.'s statement. Id. ¶ 19. C.Y. was present at all times during her hearing, and heard all of the school's evidence against her. Id. ¶ 20. With the assistance of her parents, C.Y. answered the Board's questions. Id. ¶ 21. C.Y. states that the Board also gave her a lecture on how her conduct was unacceptable. Pl.'s Aff. ¶ 7. After deliberating, the seven-member Board unanimously voted to expel C.Y. from Lakeview High School. Board of Education Minutes at 4.

On March 8, 2012, Paulson sent C.Y. a letter confirming the punishment and listing several alternative education options available in the area. 3/8/2012 Letter (Dkt. 25-11); Paulson Aff. ¶ 26. C.Y. is presently continuing her education in the Roseville school district. Antone Aff. ¶ 20.

### III. SUMMARY JUDGMENT STANDARD

Defendants seek summary judgment pursuant to Federal Rule of Civil Procedure 56. A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Biegas v. Quickway Carriers, 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks and brackets omitted).

## IV. ANALYSIS

In their motion for summary judgment, Defendants argue that they are entitled to judgment as a matter of law because (i) C.Y.'s procedural due process rights were not violated, and (ii) the individual board members are entitled to absolute quasi-judicial immunity and qualified immunity. For the reasons stated below, the Court determines that Defendants did not violate C.Y.'s procedural due process rights and grants the motion on that basis.

In their argument regarding procedural due process, Defendants assert that C.Y.'s due process rights were never violated. Defs.' Mot. at 10-17; Defs.' Reply at 1-3. Defendants argue that the school afforded C.Y. more than adequate procedural protection by: (i) providing notice to C.Y. of the charges, the possibility of expulsion, and the procedures of the disciplinary hearing; (ii) providing notice of the expulsion procedure; and (iii) allowing C.Y. to tell her side of the story, which she did three separate times.

In response, C.Y. argues that genuine issues of material fact exist regarding her suspension and expulsion from Lakeview. Pl.'s Resp. at 9-13. First, C.Y. argues that Huber suspended her on February 21, 2012 by telephone without notice of the charges against her and the opportunity to be heard. Second, C.Y. argues that she has presented direct evidence that the process provided by the school was deficient because she (i) was not given a "full opportunity to present version of events," (ii) was not provided a full description of the evidence against her until the Board's meeting, (iii) was not allowed representation, and (iv) "was banned from calling planned witnesses, such as her brother." Pl.'s Resp. at 11. C.Y. insists that a genuine issue of material fact exists regarding whether she ever admitted to the conduct for which she

7

was suspended and expelled. C.Y. also asserts that the affidavits relied upon by Defendants are supported by evidence "that is not in admissible form." Pl.'s Resp. at 14. In particular, C.Y. attacks Huber's affidavit as hearsay, in asserting that (i) C.Y. brought a knife to school, (ii) C.Y. made a Facebook post about A.B.'s mother, (iii) C.Y. texted J.Y., and (iv) C.Y. made threats against A.B. Id. C.Y. argues that these assertions should all be disregarded in deciding Defendants' motion for summary judgment. Id.

The United States Supreme Court has held that public school students facing suspension or expulsion must be afforded some procedural due process. Goss v. Lopez, 419 U.S. 565, 576 (1975). If a court determines that due process is required in connection with certain adverse action, "the question remains what process is due." Id. at 577. For short-term suspensions of ten days or less, students must receive "some kind of notice and afforded some kind of hearing." Id. at 579. The Supreme Court explicitly did not delineate the procedural due process requirements for longer suspensions or expulsions: "We should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." Id. at 584.

The Sixth Circuit has ruled on longer-term suspensions and expulsions, holding that a student faced with expulsion has the right to a pre-expulsion hearing before an impartial trier of fact, but "does not have the right to a full-blown administrative appellate process." Newsome v. Batavia Local Sch. Dist., 842 F.2d 920, 927 (6th Cir. 1988). In other words, schools must afford students notice of the hearing and a meaningful opportunity to prepare for it. See Flaim v. Med. Coll. of Ohio, 418 F.3d 629, 638 (6th Cir. 2005) (finding notice adequate in hearings to expel a

8

student from medical school). Notice should be in writing and include the charges leveled against the student, the policies and procedures at issue, and the possible penalties. Id. at 635.

The nature and extensiveness of the process afforded at a hearing should be enough for a student to have an opportunity to respond to the charges and explain and defend her actions. Id. "If the hearing is live, the accused has the right to attend all the significant portions of the hearing." Id. If a hearing is procedurally complex or uses rules of evidence, courts have recognized that a student may be entitled to counsel, but there is no absolute right to counsel. Id. at 636. Students do not have the right to cross-examine witnesses, particularly student witnesses, nor do they have the right to know the identity of their accusers. Newsome, 842 F.2d at 924-25 ("In this turbulent, sometimes violent, school atmosphere, it is critically important that we protect the anonymity of students who 'blow the whistle' on their classmates . . ."). Moreover, as a general matter, the participation of investigating administrators in the deliberation of punishment does not violate due process. Id. at 927.

Turning to the instant case, the Court concludes that Defendants did not violate C.Y.'s procedural due process rights. At every stage of the process relative to suspension and expulsion, school officials provided notice and an opportunity to be heard in a manner appropriate to the circumstances.

Upon review of the events regarding the suspension through March 6, 2012, the Court finds that notice and an opportunity to be heard were adequate. C.Y. and her mother met with Huber the day after the knife incident at school. According to Antone, Huber advised C.Y. that she could be expelled, discussed the evidence that had been collected, and confirmed that C.Y would remain suspended until the expulsion hearing. Antone Aff. ¶ 8. C.Y. does not relate information about her meeting with Huber, other than that Huber had C.Y. provide a written

statement.[6] C.Y. Aff. ¶ 5. Huber states that, at the meeting on February 22, she informed C.Y. she could be expelled, presented the evidence from her investigation, and listened to C.Y.'s version of events. Huber Aff. ¶¶ 14-16. Huber then states that she suspended C.Y. Id. ¶ 17. . Given the seriousness of the charge and the evidence before Huber – and the timely opportunity provided C.Y. to explain her version of the events – Huber did not violate C.Y.'s procedural due process rights in suspending C.Y.

After this meeting and during the suspension, C.Y. and Antone had a meeting with Huber before Paulson, the Lakeview superintendent. Paulson heard from both sides, reviewed the evidence, and told C.Y. that he would seek expulsion at the Board hearing. The Court concludes that Defendants provided C.Y. "some kind of notice and afforded some kind of hearing." Id. at 579. C.Y. was not entitled to any greater measure of procedural due process for her suspension and has not cited any authority supporting some greater measure.

With regards to the expulsion hearing of March 6, 2012, Defendants did not have to afford C.Y. a "full blown administrative appellate review," but did have to provide notice and a hearing. Newsome, 842 F.2d at 927; see also Flaim, 418 F.3d at 635 (stating that the "stronger the private interest, . . . the more likely formal written notice – informing the accused of the charge, the policies or regulations the accused is charged with violating, and a list of possible penalties – is constitutionally required"). Prior to the expulsion hearing, Defendants sent two letters to C.Y.'s parents. As discussed above, these letters contained the allegations, citations to applicable law, policies, and penalties, and explained to C.Y. of when and where her expulsion hearing was to occur. Given that the first letter, dated February 23, 2012, notified C.Y. that she

---

[6] There is no evidence, contrary to C.Y.'s counsel assertion at oral argument, that Huber threatened or coerced C.Y. to write her statement.

10

may face expulsion, C.Y. had adequate time to prepare for her expulsion hearing, which occurred twelve days later. Notice was adequate.

In addition to the alleged insufficiency of notice, C.Y. complains that the hearing before the Lakeview Board was unfair because she (i) was not given a "full opportunity to present her version of events;" (ii) was not provided a full description of the evidence against her until the Board's meeting; (iii) was not allowed representation; and (iv) "was banned from calling planned witnesses, such as her brother." Pl.'s Resp. at 11. The Court rejects these arguments.

First, regarding C.Y.'s opportunity to be heard, C.Y. met with Huber and Paulson and explained her version of events. C.Y. also appeared at the hearing before the Board and answered the Board's questions. C.Y. has not presented any evidence to rebut Defendants' arguments that the Board gave her an opportunity to speak.

Second, Sixth Circuit law does not require a school board to disclose all of its evidence or reveal identities of student witnesses. Flaim, 418 F.3d at 635-636. C.Y. had two meetings with school administrators prior to the hearing, where the administrators discussed the evidence with her. Thus, C.Y.'s claim that she was not provided a full description of the evidence against her is unavailing.

Third, regarding C.Y.'s allegation that she was not made aware of her right to counsel, courts have held that a student does not enjoy such a right, as here, if the school does not have counsel. Id. at 640. Additionally, C.Y. did not dispute Defendants' counsel statement at oral argument on the motion for a TRO and preliminary injunction that the student handbook supplied to C.Y. advised of her that right. The Court held, in its order denying C.Y.'s motion, that this disposed of C.Y.'s claim that her right to counsel was violated. 9/11/2012 Order at 7 (Dkt. 21).

11

Fourth, the Board's barring C.Y. from calling witnesses is similarly meritless. C.Y. had the opportunity to call witnesses because her father spoke on her behalf, reading C.Y.'s brother's written statement. Flaim, 418 F.3d at 636. That the Board would not allow her brother to read the statement did not violate due process because the substance of the statement was communicated and there is nothing in the record that indicates that the Board prevented C.Y. from presenting exculpatory evidence.

C.Y. also argues that portions of Defendants' affidavits contain impermissible hearsay. However, the Sixth Circuit has recognized the difficulty of school administrators in conducting investigations of misconduct, holding that "the rights at stake in a school disciplinary hearing may be fairly determined upon the 'hearsay' evidence of school administrators charged with the duty of investigating the incidents. We decline to place upon a board of laymen the duty of observing and applying the common law rules of evidence." Newsome, 824 F.3d at 926. Clearly, the Lakeview administrators could rely on hearsay in conducting their investigation. Thus, the existence of hearsay in Defendants' evidence does not undermine the procedural due process afforded C.Y.

In sum, Defendants provided more than adequate process.[7] Because C.Y.'s procedural due process rights were not violated, the Court does not reach the defenses of absolute and qualified immunity raised by Defendants.

---

[7] Plaintiff maintains that her suspension actually began on February 21, 2012, so as to argue that the suspension was greater than ten days – the alleged threshold for a greater measure of due process. The Court rejects this argument because the evidence indicates that the suspension was not longer than ten days. C.Y. left school on February 21 on her own. C.Y. stated that she "called my brother, Christopher, and asked him if could come pick me up because I felt sick. He came and got me from school, then took me home." Pl.'s Aff. ¶ 4. C.Y. and Antone state that they understood that Huber suspended C.Y. with her phone call on February 21. But the effective starting point of the suspension was the next day because there was no loss of school privileges until the morning of February 22. Given that the expulsion took place on March 6, the

## V.  CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment (Dkt. 25) and dismisses C.Y.'s complaint.

SO ORDERED.

Dated:  May 10, 2013                              s/Mark A. Goldsmith
           Flint, Michigan                              MARK A. GOLDSMITH
                                                                United States District Judge

### **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 10, 2013.

                                                                s/Deborah J. Goltz
                                                                DEBORAH J. GOLTZ
                                                                Case Manager

---

suspension only lasted ten school days.  Even if the suspension were deemed to have started on February 21, in the evening, over the phone, this is not a material fact because, as Defendants correctly note, there is no authority holding that suspensions of that length do require more formal process – only that they may require it.  Goss, 419 U.S. at 584.  Huber did not violate C.Y.'s due process rights because she met C.Y. the next morning with her mother and brother.  Huber Aff. ¶ 14; Antone Aff ¶ 8.  At this morning meeting, C.Y. was able to present her side of the story and Huber informed C.Y. that she could be expelled.  Defendants did not have to afford C.Y. more process, and C.Y. does not explain what greater process she should have been given under the circumstances.